# Richmond

## TIDEWATER STEVEDORING CORPORATION v. HERBERT WARD McCORMICK.

March 7, 1949.

Record No. 3432.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*White, Ryan & Holland* and *John Marshall*, for the plaintiff in error.

*A. L. Bivins* and *A. Jeffery Bivins*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Herbert Ward McCormick, hereinafter called the plaintiff, instituted this action by notice of motion to recover damages for personal injuries alleged to have been sustained by reason of the negligence of the Tidewater Stevedoring Corporation, hereinafter referred to as Tidewater or defendant.

Tidewater filed a special plea alleging that, at the time of the injury, the plaintiff was an employee of the defendant, as that term is defined in "The Virginia Workmen's Compensation Act," as amended by an Act of the General Assembly 1944, (Acts 1944, chapter 77, page 97), 1948 Supplement to Virginia Code, 1942, (Michie), section 1887 (2b); and that since his injury arose out of and in the course of his employment, he was barred from recovering any judgment for damages against defendant. Virginia Code, 1942, (Michie), section 1887 (12).

By consent of parties, the special plea was heard by the trial court. Considerable evidence was presented. On consideration thereof, the court held that as a matter of law the plaintiff was not an employee of the defendant. The defendant excepted, and, by agreement of counsel, the evidence heard on the plea was ordered to be included in the record of the case. Thereafter, issue was joined and the action proceeded to trial on its merits. At the conclusion of plaintiff's evidence and at the conclusion of all the evidence, the court .overruled a motion to strike plaintiff's evidence.

The jury were given four instructions at the request of plaintiff and six at the instance of the defendant. These instructions defined negligence, contributory negligence and proximate cause, and set out the duties and obligations of each of the parties and their respective theories as to the cause of the accident. The jury returned a verdict for the plaintiff in the sum of $6,500. A motion to set it aside as contrary to the law and the evidence was overruled and judgment was entered accordingly.

It is well, we think, to review the evidence as a whole,

bearing in mind that the court having held plaintiff was not an employee of the defendant, that question was not presented to the jury.

Tidewater is a stevedoring company, as its name implies. For sometime prior to September, 1946, under a "war-shipping stevedoring form of agreement," not shown in the record, it was called upon to load and unload vessels operated by various steamship companies under contract with the U. S. Maritime Commission. On September 30, 1946, the S. S. "Mexican" was berthed at Pier X at Newport News, Virginia, to be loaded with horses. The Hawaiian-American S. S. Company, operators of the steamship, under the contract with the U. S. Maritime Commission, called upon the defendant to load its vessels with 579 horses. It was necessary to load these horses by hoisting them to the ship confined in wooden crates called flying stalls. The horses were funneled from corrals through chutes or runways, leading to gates at the end of the chutes beneath the booms of the ship. The flying stalls, box-like compartments six feet long, with doors at each end, are placed to connect with gates at the end of the chutes, and by the opening of the gates, the horses walk from the chute into the flying stall. The door of the flying stall is then closed and locked, and the horses and flying stall are lifted by winches and booms over the side of the ship and lowered through opened hatches into its hold. When the flying stall is landed, one of its gates is opened, and the horse is led to a prepared stall on the ship. The empty flying stall is then returned from the ship to the pier and the operation is repeated until all of the animals have been loaded on the ship.

The entire loading operation in this case was in charge of the employees of the defendant. There were six gangs of workmen engaged in serving six chutes and six hatches of the ship. Each gang consisted of twelve men,—the hatch boss, that is, the foreman on the deck of the ship, three other deck men,—two at the winches and a gangwayman,—four men in the hold of the ship, and the remaining four on the dock or pier. Of the four on the pier, it was the duty of

two of them, called "slingers," to give a signal to the gang-wayman when the stall was ready to be hoisted. The gangwayman, in turn, gave a signal to the winchmen to begin, the winchmen not being in a position to see the pier. After the horse had been let out of the stall in the hold, a man in the hold was required to signal the gangwayman when the stall was ready to be lifted. As the stall came up out of the hold the gangwayman was to walk over to the side of the ship to a position where he could get a signal from the "slingers" that they were ready to receive the stall on the pier and line it up in position to receive an-other animal. The stall was not to be lowered until the "slingers" gave a signal for that purpose. The third man on the pier was to "push the horse up to the flying stall." The fourth man was placed lower down the chute to drive the horses up.

The horses being shipped were not shod, and "practically half are wild." During the loading operations, it sometimes happened that those inclined to be fractious would become excited, fall down, get crowded or tangled up, and damage the sides or gates of the chutes or stalls. Carpenters were kept on hand to repair the broken or injured chutes or stalls. There were also kept on the pier three or four veterinarians checking the condition of the horses and deciding whether they were to be loaded on the ship or rejected, and some checkers.

From the pier to the deck of the "Mexican," the distance was about twenty to twenty-six feet. There was a walk-way about eight feet wide between the chute and the edge of the pier to which the vessel was berthed.

The Waterfront Lumber & Shipceiling Corporation*, here-inafter referred to as Waterfront, had an arrangement or contract with the Hawaiian-American Steamship Company, the full terms of which are not in evidence, whereby it was

*In maritime usage, according to the Shipbuilding Cyclopedia, published by Simmons-Broadman Publishing Company, the word "ceiling," is "a term applied to the planking with which the inside of a vessel is sheathed; also applied to the sheet metal or wood sheathing in quarters and store-rooms of a ship."

to furnish men to repair and maintain the stalls and run-ways used by the defendant in loading and unloading its ship.

Herbert Ward McCormick, fifty-six years old, a resident of Newport News for forty-nine years, had, for a long period of time, worked on the waterfront. On March 9, 1946, he was employed as a carpenter by Waterfront. Thereafter he was engaged, with other carpenters supplied by Waterfront, in repairing chutes and stalls used in loading horses on ships, in accordance with the contract between his employer and certain steamship companies.

On September 30, 1946, the plaintiff was ordered by a Mr. Parks, a foreman of Waterfront, to report, with some fellow carpenters employed by Waterfront, to Pier X, where the S. S. "Mexican" was to be loaded by Tidewater. The "Mexican" was delayed in docking, and plaintiff worked on the loading of another ship until 12:00 o'clock M. He was then sent by Parks to Pier 6. About 3:00 p. m., at the direction of Parks, he returned to Pier X, where the loading of the "Mexican" had begun. He immediately entered upon the performance of his duty, that is, the maintenance and repair of the chutes and stalls.

About 4:30 p. m. of that day, when he had finished re-pairing three flying stalls, he was requested by a foreman of the defendant, Tidewater, to repair another stall that had been damaged. He obtained two pieces of lumber for that purpose, and was carrying them on his shoulders to his place of work when he was requested by a "slinger" to put a new latch on a gate through which a horse had just broken out. He replied that he would put the latch on just as soon as he finished the work he had started to do. He then noticed that the escaped horse was running wildly up and down the pier in the narrow space between the chutes and the edge of the dock. He watched the movements of the horse to avoid being knocked down and trampled. While he was thus looking out for his own safety, the winchmen on the ship lowered the boom to which was attached an empty flying stall, weighing be-

tween 2400 and 2600 pounds. This flying stall struck the plaintiff, and inflicted upon him severe injuries of a permanent nature.

The two "slingers," whose duty it was to receive and guide the stalls as they were lowered to the pier, were at the moment of plaintiff's injury engaged in running horses to another flying stall to be lifted to the ship. They were not watching out for the stall that was being lowered because they had given no signal to the gangwayman on the deck of the ship, and they were not ready to receive it. The winchmen are so located on the ship that they cannot see the floor of the pier to which the stall is lowered. We are not told whether they received a signal from the gangwayman or where he was at the time. No one saw the descending stall as it was about to strike the plaintiff, and no warning of any nature was given to him.

The record shows that Waterfront was paid for the services of its carpenters by the Hawaiian-American S. S. Company; and that Waterfront paid plaintiff's salary, paid his social security tax, witheld the required portion of his Federal income tax, and carried workmen's compensation insurance on him. Plaintiff was not carried on defendant's roll of employees. Defendant did not pay his social security tax, withhold any portion of his income tax, or carry workmen's compensation insurance for his benefit. Both corporations carried their workmen's compensation insurance with the same insurance carrier.

The plaintiff's employment with Waterfront required him to perform repair work on the stalls and runways used by the defendant. He was merely informed by defendant when, where, and what repairs were needed. The orders he received simply pointed out to him the work which Waterfront was under contract with the steamship company to do. He was not controlled in his method or means of work. The only supervision exercised by defendant was to the extent that he would work to the advantage of the other men engaged in the loading operations. Defendant had no right to discharge him; it could merely report his

work as unsatisfactory to Waterfront. The work which he was doing was no part of the contract of stevedoring for which the defendant was being separately paid by the steamship company. His hours of labor necessarily conformed to the hours of labor of the defendant's employees. However, he received pay from Waterfront from the time he reported to work until the time he left, whether he worked or not. His compliance with defendant's directions merely showed cooperation rather than subordination.

It is worthy to note that the record is silent as to the ownership of the stalls and runways. Since the defendant was not obligated to keep them in repair, and did not bear the expense of so doing, it is reasonable to assume that they belonged to the owner of the pier, to Waterfront, or some one else. Further, the failure to show that the defendant owned the stalls and runways, or was under some obligation to repair them, indicates that the repairs were not "in the usual course of defendant's trade, business, occupation or profession."

We have examined the authorities submitted to us by the defendant. While pertinent as to principles which determine the question whether the relationship of master and servant exists, the decisions in those cases are based on facts essentially different from those before us.

In *Atlantic Coast Line R. Co.* v. *Tredway*, 120 Va. 735, 744, 93 S. E. 560, 10 A. L. R. 1411; *Baker* v. *Nussman*, 152 Va. 293, 303, 147 S. E. 246; and *Ideal Steam Laundry* v. *Williams*, 153 Va. 176, 180, 149 S. E. 479, we stated the following rule:

"At common law, upon the question of whether the relationship of master and servant exists, there are four elements which are considered: (1) selection and engagement of the servant; (2) payment of wages; (3) power of dismissal; and (4) the power of control of the servant's action.

"But, * * * the first, second and third of these elements are not essential to the relationship. The 'power of control,' is the most significant element bearing on the question."

In those cases general servants had ceased for the time being to be the servants of their original masters, and had passed under the direction and control of another person, upon whose work they were engaged.

"The ordinary test is, 'Who has the power to control and direct the servants in the performance of their work?'" *Texas Co.* v. *Zeigler,* 177 Va. 557, 14 S. E. (2d) 704.

See 35 Am. Jur., Master and Servant, section 539, and 56 C. J. S., Master and Servant, section 3 (3).

For the general rule, see Annotation 55 A. L. R. page 1263: "One in general employment of contractee, but who at time of accident was assisting or co-operating with, an independent contractor, as employee of former or latter for the time."

In this case the defendant had no power of control over plaintiff, the most significant element bearing on the question of their relationship. There was ample evidence to support the finding of the trial judge that the plaintiff was the employee of Waterfront.

The judgment of the trial court as to the credibility of witnesses and the weight to be given to their testimony when the case is submitted to him on the evidence is entitled to the same weight as the verdict of a jury. His finding will not be disturbed by this court unless it is against the plain preponderance of the evidence or wholly without evidence to support it. *Bunkley* v. *Commonwealth,* 130 Va. 55, 108 S. E. 1; *Artrip* v. *Kelly,* 145 Va. 422, 134 S. E. 690; *Hayes* v. *Strauss,* 151 Va. 136, 144 S. E. 432; *Nix* v. *Nix,* 186 Va. 14, 20, 41 S. E. (2d) 345; Vol. 1 Digest of Va. and W. Va. Reports (Michie) and Permanent Supplement (Michie), Appeal and Error, section 322 and numerous cases cited.

In *Standard Oil Co.* v. *Anderson,* 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480, the court had occasion to consider whether the relation of master and servant existed under facts somewhat analogous to those before us. In that case, the plaintiff was a longshoreman employed by a master stevedore. The stevedore was under contract with a shipper,

the defendant, to load a vessel. A winchman in the general employ of the defendant shipper performed the necessary hoisting and lowering operations, and for this the stevedore paid the defendant agreed compensation. The winchman negligently lowered cargo on the plaintiff. Plaintiff sued the shipper for damages. Defendant contended the winchman was, under the circumstances, a "loaned employee" of the stevedore. Plaintiff recovered a judgment against the defendant in the lower court. The Supreme Court affirmed the judgment, holding that the shipper was the master of the winchman and responsible for his negligence. In that case the court said:

"It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become *pro hac vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary co-

operation, where the work furnished is part of a larger undertaking."

The court also quoted the following from the opinion of Holmes, C. J., (afterwards Mr. Justice Holmes), in the case of *Driscoll* v. *Towle*, 181 Mass. 416, 63 N. E. 922: " 'But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant; more than that it is necessary to take him out of the relation established by the only contract which he has made, and to make him a voluntary subject of a new sovereign,—as the master sometimes was called in the old books.' "

The second and third assignments of error may be considered together. The defendant contends that there was no evidence showing negligence on its part; that the plaintiff was guilty of contributory negligence as a matter of law; and that the plaintiff assumed all risks ordinarily incident to his employment.

The mere recital of the evidence shows that there was negligence on the part of defendant's employees. Plaintiff was an invitee. It was necessary for him to be where he was to perform his duty. He was there with the knowledge and consent of the defendant, and it was the duty of the latter to exercise ordinary and reasonable care for his safety while plaintiff was engaged in his employment. The winchmen, who could not see the heavy flying stall after it left the side of the ship, and the gangwayman, whose duty was to await a signal from the "slingers", were lowering the stall without any direction from any one as to the time and place of its descent, in an area where a number of men were known to be working. The "slingers," whose duties were to give a signal for its descent and direct a safe landing, were absent from their stations. There was no notice to plaintiff that the operation would be conducted otherwise than as usual.

The question of contributory negligence was properly submitted to the jury. We cannot say that reasonable, fair-minded men could only conclude that the plaintiff failed to

exercise the care which a reasonable and prudent man would have exercised under similar circumstances.

With a load of lumber on his shoulder, the plaintiff's attention was unexpectedly diverted by a horse running about in the narrow space where he was working. He saw no employees of the defendant making preparations to receive a lowered flying stall. No warning signal was given to him of danger from any source. He naturally and reasonably gave his attention to the imminent danger presented by the movements of a fractious horse. At that moment there was nothing to indicate danger from a lowered stall. The jury accepted his testimony, as it had the right to do, and we cannot say that they were not justified.

No specific instruction upon the doctrine of assumption of risk was requested of the trial court or given to the jury.

The instructions which were given at the request of the defendant, and set out the law of the case from its standpoint, were based wholly upon its contentions, first, that it was free from negligence in that it exercised the degree of care ordinarily and customarily employed by others in the stevedoring trade, and, second, that plaintiff, aware of its method of operation, had failed to exercise reasonable care and caution for his own safety, and thereby was guilty of negligence which contributed to the accident.

In *Rust* v. *Indiana Flooring Co.*, 151 Va. 845, 860, 145 S. E. 321, we said:

"It is an axiom of appellate practice, that only questions raised in the trial courts can be reviewed in this court by writ of error or appeal, unless the order or decree is void, upon the face of the record, for lack of jurisdiction or otherwise."

To the same effect see *Stevens* v. *Mirakian*, 177 Va. 123, 129, 12 S. E. (2d) 780; and Vol. 1 Michie's Digest of Va. & W. Va. Reports, Appeal and Error, section 234, where numerous other cases are cited.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*