# Richmond

## Southern Stevedoring Corporation v. Walter C. Harris.

March 13, 1950.

Record No. 3617.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*White, Ryan & Holland,* for the plaintiff in error.

*Louis Lee Guy,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Harris, plaintiff below, recovered a verdict and judgment for $5,500 against Southern Stevedoring Corporation, defendant below, for personal injuries suffered by him when he was struck by a trailer which became uncoupled from its tractor as they were being operated by the defendant in loading a ship.

The ship, *American Veteran,* was owned by U. S. Lines, and the defendant had contracted to furnish it such stevedoring services as were required in the port of Norfolk. The plaintiff was employed as a checker by the U. S. Lines, with the duty of inspecting the cargo to be loaded by the defendant, seeing that the loading was properly done, and making reports to the ship owner as the work progressed.

The plaintiff was engaged in this work at the time he was injured, around 9:30 a. m., May 26, 1948. The ship was berthed at the northern side of army base Pier No. 1. The cargo immediately being loaded was a pile of oak planks, stacked in the housed-in part of the pier, and being hauled to the ship through a doorway in the shed on trailers pulled by tractors or motors operated by the defendant. This doorway was approximately opposite and south of No. 5 hatch, into which the planks were being loaded. A little to the east of the doorway, between it and the planks, were some steel drums and plaintiff was standing behind these drums facing the ship and watching the loading. The planks were some distance to his right. The loading had been in progress since about 8:30 a. m. The motors, with their trailers, had been running in front of him between the planks and the ship. One of these units, however, con-

sisting of a motor and two trailers, after delivering its load to the ship, came back through the doorway at what the plaintiff described as a rapid rate of speed and made a sharp turn to go around behind plaintiff. When it did so, the motor proceeded straight ahead behind the plaintiff but the trailers broke loose from the motor, turned in toward the plaintiff and caught him between the end of the front trailer and one of the steel drums, breaking both bones of his right leg below the knee. He was painfully and seriously injured, requiring some two weeks of hospital treatment, and was unable to work for several months thereafter.

The defendant contended below and asserts here: (1) That the plaintiff was an employee of the defendant, confined to the rights provided by the Workmen's Compensation Act, and prohibited from maintaining this common-law action by that act (Acts 1918, ch. 400, p. 637, as amended; Code, 1942 (Michie), section 1887(1), *et seq.*; Code, 1950, section 65-1, *et seq.*); and (2) that the evidence failed to show actionable negligence on the part of the defendant.

■ The issue of whether the plaintiff was an employee of the defendant was specifically submitted to the jury. Their finding that he was not was amply supported by the evidence for the plaintiff, to the effect that he was employed by the dock superintendent of the U. S. Lines, who controlled all his actions and instructed him what to do; that he made report of his work each day to the dock superintendent, who alone had the right to hire and fire him, and that he received no instructions from the defendant and would not have had to obey them if he had, unless they coincided with the orders of the dock superintendent. Not only so, but the character of the plaintiff's work itself was evidence that he was necessarily an employee of the U. S. Lines. He was a checker, charged with the duty of inspecting and checking the cargo on the pier, seeing that it was placed in the ship where the ship owner wanted it to be, and whether any damage was done to it by the defendant in loading. This was service for the ship owner, to facilitate

the unloading of the cargo and to place responsibility in event it was found damaged on delivery. He represented the U. S. Lines in this work, not the defendant.

The contract between defendant and U. S. Lines provided that the defendant should load the vessel at a rate per ton, and would furnish extra labor, when authorized, at cost plus ten per cent. and insurance. Defendant paid to the plaintiff his wages and reported the accident to the Industrial Commission for compensation, which the plaintiff refused. Defendant's president testified that in his opinion his company could discharge a person on its payroll but admitted that in an experience of twenty years he had never discharged a checker. Defendant relies on evidence of these facts to support its contention that the plaintiff was its employee. They are not sufficient to overcome the plaintiff's evidence to the contrary. Unless he was in fact defendant's employee, the efforts of defendant to bring him under its compensation insurance would not make him so against his will. The evidence for plaintiff, from the dock superintendent of U. S. Lines, was that plaintiff was not furnished by the defendant as extra labor, but furnished by the U. S. Lines and his work controlled by it. While he was paid his wages by the defendant, the defendant billed U. S. Lines for the amount and it was repaid by that company. The evidence supports the inference that this was done as a matter of convenience, since the plaintiff's hours of work were variable and of necessity must coincide with the work done by the defendant. If plaintiff was not paid for what he claimed was enough time, he complained to the dock superintendent and looked to him for correction.

Whether the relation of employer and employee exists in a given case depends upon the facts. As we have frequently said, the most significant fact bearing on that question is the power of control. *Ideal Steam Laundry* v. *Williams*, 153 Va. 176, 180, 149 S. E. 479, 480; *Texas Co.* v. *Zeigler*, 177 Va. 557, 14 S. E. (2d) 704; *Tidewater Corp.* v. *McCormick*, 189 Va. 158, 52 S. E. (2d) 61. In the last-

named case, involving the same question, on different but related facts, we held that the defendant there had no power of control over the plaintiff, "the most significant element bearing on the question of their relationship," and that there was ample evidence to support the finding that the plaintiff was not the employee of the defendant. (189 Va. at p. 167, 52 S. E. (2d) at p. 65). We reach the same conclusion here. The facts of this case distinguish it from *Waugh* v. *Rollison*, 169 Va. 268, 192 S. E. 694, relied on by defendant.

The more difficult question is whether there was sufficient evidence to support the finding of the jury that the defendant was guilty of negligence which was a proximate cause of the plaintiff's injuries. The question is to be determined by the settled rule that, in view of the verdict, the evidence is to be considered in the light most favorable to the plaintiff and if reasonable men may fairly differ as to the proper inferences to be drawn from the facts proved, the issue is for the jury. *Filer* v. *McNair*, 158 Va. 88, 92, 163 S. E. 335, 337; *Edgerton* v. *Norfolk Southern Bus Corp.*, 187 Va. 642, 653, 47 S. E. (2d) 409, 414.

The plaintiff alleged that the defendant's negligence consisted of operating the motor and trailers at excessive speed and in a defective condition. His testimony was that the motor was being run very fast, too fast for safety, so fast it was dangerous, and that when he was struck the print of his leg was left in the steel drum. He did not attempt to fix the speed any more definitely than that. These trailers weigh about 600 pounds each. The defendant's evidence was that the motor was controlled by a governor which did not permit a speed of more than six or seven miles an hour. The width of the motor and trailers was not shown. The space behind the plaintiff in which the motorman undertook to run was only about ten feet wide. But if it be granted that the motor and trailers were being operated dangerously fast, still it was not shown, beyond mere speculation, that their speed was an efficient cause of the trailers' breaking away from the motor.

The evidence shows, on the other hand, that a defective coupling permitted the trailers to break loose. This coupling was a metal device attached to the motor. There is no adequate description of it in the evidence, but it was exhibited to the jury and pictures of it were filed as exhibits with the evidence. On the end away from the motor is a slot into which presumably the coupling on the trailer (the evidence does not refer to it) fits and is held in place by a finger or hook attached to what is called a latch. This latch is pivoted on a bolt and at its end opposite the hook is a coil spring which pushes vertically against that end and holds the hook in place at the other end. On the top of this latch is a rope or chain by means of which the latch is raised to uncouple the motor from the trailer. A few minutes after the accident it was discovered that the coil spring in the coupling was broken. This apparently allowed the latch to rise and release the trailers from the motor.

The defendant's superintendent of equipment testified that the spring was broken half in two, but when asked as to its condition otherwise, he said he threw it away, with the somewhat strange explanation that he did not know there was going to be a case about it.

The defendant then undertook to show that the breaking of the spring, resulting in the uncoupling of the trailers, was not due to its negligence. Its equipment superintendent testified that it had 26 of these motors, all equipped with this type of coupling, which was the best he was able to get. The superintendent of another stevedoring company testified that his company used the same type of equipment, which was the latest that came out during the war years. Defendant's superintendent also testified that these coil springs were ordered from the factory, that he had four in his storeroom, and that during his seven years with the defendant there had been only one previous occasion when a spring had broken; that this was some two years or more before this accident and he could not remember whether it was then discovered before the motor went on its run. He

further testified that he inspected this motor before it went out that morning; that the ordinary routine inspection of the coupling consisted of lifting the latch, "and if that spring has got tension, it is all right." He was asked:

"Q. That morning prior to the accident, did you have occasion to lift the latch?

"A. Well, I always inspect equipment before it goes out on the job.

"Q. Did you lift the latch?

"A. Yes, sir.

"Q. What kind of tension was there on it?

"A. The tension was good."

He said he knew of no other test and there was no way you could tell when a spring was going to break by looking at it. But he further testified that it was a very weak spring which did not put much pressure on the latch. The other maintenance superintendent also testified that there was no other or better way to test it.

The dock foreman of the defendant testified that he drove the motor down to the pier that morning; that he lifted the latch probably eight times in making couplings and "there was a tension in the spring."

However, defendant's superintendent further testified that during the war years these motors were operated twenty-four hours a day; that the spring in the coupling on the motor in this accident was there when he came seven years before. In addition to the testimony of the superintendent that one of these springs had broken one or two years before, the driver of this motor was asked, on direct examination, whether he had had any trouble with the coupling prior to the accident. He replied, "No, not that day, no." He was then asked on cross-examination when was the last time he had had trouble with the coupling, and his reply was "About three or four months; it come aloose on it but did not hit nobody but it run wild. I caught it." He then said that was not the same motor he was driving on the day of the accident.

The plaintiff testified that he had known these trailers to come loose from the motors several times while he was working there and in fact that morning the trailers came loose from that same motor.

We do not think the jury were bound to accept the testimony of the defendant that the only way to test the spring in the coupling was to raise the latch. One of the pictures giving a view of the top of the coupling shows that a substantial part of this spring is visible and indicates that it would be a simple matter to take it out and examine it.

It was established that this spring was defective. Nobody had looked at it for more than seven years. During a large part of that time it had been operated night and day on the waterfront. It could hardly be supposed that it would never be weakened by use or rust. The effectiveness and the safety of the coupling depended on the functioning of this spring. It was shown that one had broken two or more years before; that the coupling had come loose on one of the motors—and the jury could have concluded it was this one—three or four months before this accident; and there was evidence that the jury could have accepted that the couplings had come loose on several other occasions and that the one on this very motor had come loose on that morning before the plaintiff was struck.

The evidence given for the defendant as to the character of its inspection, illustrated by the quotation above, could have been viewed by the jury as not convincing that it was more than perfunctory. They had a right to conclude that the failure of the spring which caused the trouble was due to its weakening from rust or use, and that, in view of its very long use and the conditions under which it was used, the exercise of reasonable care required that an examination be made of the spring itself; and the jury could also have concluded that the necessity for this kind of inspection should have been made all the more apparent by the recent trouble with the couplings, including the occasion earlier on the same morning the plaintiff was injured.

In *Chesapeake, etc., R. Co.* v. *Allen*, 137 Va. 516, 522, 120 S. E. 157, 158-9, Judge Burks observed: "Courts constantly have to refer to juries the question of what is reasonable conduct, or reasonable prudence, under all the circumstances of the case, with no other guide than their own judgment and conclusion as reasonable men." *Morris* v. *Peyton*, 148 Va. 812, 827, 139 S. E. 500, 504; *Filer* v. *McNair, supra; Wynn* v. *Gandy*, 170 Va. 590, 594-5, 197 S. E. 527, 529.

We think the jury had a right to conclude that the plaintiff's injuries were attributable to the failure of the defendant to exercise reasonable care to inspect the equipment it was operating, and hence it cannot be said that their verdict was without sufficient evidence to support it.

This conclusion makes it unnecessary to discuss plaintiff's assignment of error to the refusal of the court to give his instruction to the effect that the doctrine of *res ipsa loquitur* was applicable to the case.

The judgment of the trial court is

*Affirmed.*