## CAPITAL RACEWAY PROMOTIONS, INC. *v.* BEVERLY VALENTINE SMITH ET AL.

[No. 941, September Term, 1973.]

*Decided July 22, 1974.*

The cause was argued before ORTH, C. J., and THOMPSON and LOWE, JJ.

*Laurence T. Scott* for appellant and cross-appellee.

*Joseph A. DePaul* and *John F. Calabrese,* with whom were

*DePaul, Willoner* & *Kenkel* on the brief, for appellees and cross-appellants.

Lowe, J., delivered the opinion of the Court.

A defect inherent in the nature of man is that perversity of spirit which attracts us to spectacles of danger in which our fellow men risk death for our amusement. Although the events in the coliseums of ancient Rome were somewhat different from those held in their modern counterparts, spectators were perhaps subject to similar risks for there must have been occasions when a lion escaped the arena to prowl among the patrons or a gladiator lost control of his weapon to the detriment of a front row observer.

On April 24, 1971 a "funny car," designed to reach speeds in excess of two hundred miles an hour in a quarter of a mile, left the track at Capital Raceway and rolled over an anchor-type fence mashing it down upon spectators in the stands. Ironically the vehicle was travelling backward at a relatively slow speed. Among those injured (some were seriously hurt, while others were more fortunate) were the appellees (and cross-appellants) Emma Smith and her son Harold Jr., Beverly Smith, Albert Alvino and William Ledbetter.

The appellees had come to witness one of those spectacles of speed which had made famous such names as Don Schumacher and Dale Creasey, cross-appellees, who respectively owned the body and chassis of a "funny car," known as the "Ram Charger," which was to be driven by cross-appellee Terrence Allen Marshall. That evening's race against the "Chi-Town Hustler" ("the heaviest race in the country") was to be held on a track leased to and controlled by Capital Raceway Promotions, Inc., appellant. The fuel used was nitromethane with the help of which the "Seventy-One Stardust Barracuda machine . . . cranks up at 1500 to 1700 horsepower and turns at top speed of 215 miles an hour."

The appellees were seated in the "pit area," about one hundred and fifty feet behind the starting line. This area is

considered desirable seating for those interested more in the preparations for a race than in its conclusion. The stands are separated from the roadway by a rather narrow walking space between the first row and a chain link fence on metal posts at the edge of the track or roadway.

Spectators are attracted to this area not only by the preparation in the "pit" by mechanics and waiting racers but also by a preliminary exhibition. The one piece body of the "funny car," which has no doors or hood, is raised on a hinge attached to the chassis to expose motor and interior. The driver dons his fire suit (which resembles a space suit), helmet and goggles. He then enters the car and is strapped in as he is towed to the "staging area."

At the staging area the vehicle is started with an " . . . electric aircraft starter that hooks from the outside on the snout of the blower." The body is then lowered and latched in place.

The next procedure and its consequences that night are best described in a statement made by the driver:

" 'We do two burn-outs, a wet one and a dry one. The purpose of the wet one is to get glue, we call it bleach, on the tires. They pour liquid butyl rubber under the rear tires. And I put the car in overdrive and I spin the tires through the glue and across the starting line from the staging area maybe one hundred to two hundred feet to lay down a sticky surface for traction down the track to get it ready, you know, for when I make my pass.

" ' . . . So, I made my wet run, then backed the car to a place just in back of the starting line, but in front of the bleach area, and I did my dry burn-out. You do dry burn-outs to dry the tires so when you launch on your run you are sure the tires won't spin and to make sure it will hook up, launch straight.

" 'Now, the second burn-out is done in low gear, or what we call direct drive. I only did two, one wet and one dry. Then after the second burn-out across the starting line again I backed the car to about

twenty feet back of the starting line and stopped, that is right, come to a complete stop.

" 'Now, this transmission also has a direct reverse, and because it has straight cut gears in it sometimes when you stop and the gears aren't aligned you can't shift. So, I wasn't aligned when stopped at that point, and I had to move the car slightly to align the gears. It has an automatic triple disc [power] glide clutch, and the only way you can move the car is to increase the rpms. So, I brought the motor slightly up to a point where the car started to move back slowly. This kind of transmission is kind of delicate, you understand, and quite expensive. So, I never shift unless I am at a dead stop. I guess that time I moved the car about one foot backwards, not really under power, just coasting.

" 'Well, neutral and reverse are so close it is hard to tell which you are in momentarily, but I attempted to stop the car and the brake pedal went right to the floor. The car was still moving, barely moving, and it just continued rolling backward.

" 'My next thought was just to jam it into forward gear. I kept pulling on the lever but it just wouldn't go in. At this time the car probably went another forty or fifty feet backwards. I don't [believe] the car was under power. I was in neutral or reverse, I don't really know which one. I guess I was going about five miles an hour at that point, not fast. I never had this kind of experience before in my career. Once you are strapped in you can't turn around to see behind you, there is no way. I thought I was going to back into the tow truck, you know. My concern was the brand new body we had just put on the car. The whole thing is fiberglass, one piece, costs about $4,000. The paint job is seven or eight hundred dollars alone.

" 'I thought of turning off the ignition, but that wouldn't have stopped me from rolling backward.

There is no manual brake, I was just strapped in the car helpless. Well, I didn't know where to steer. I couldn't see. I had looked at the track beforehand from the starting line to the finish and it looked pretty good. I was satisfied with it. My only concern, other than that, was the lighting, and the track lights were pretty decent. I have seen worse and better, but they were sufficient for two hundred miles an hour speeds. I never paid much attention to the staging area.

" 'So, the car kept rolling backward for a considerable distance. I didn't know what was behind me, other than maybe other race cars or tow trucks. I was aware of that. And I felt this jerk and the rear of the car lifted up in the air as it rolled up on the fence. The wheely bars [1] caught in the fence and stopped me but then I shut the motor off, and that is when I heard people under the car, kids, screaming, people, I don't know who. Seemed like everybody just tore the body off the car while I was still sitting there, for souvenirs, I guess. Then I got out. I wasn't hurt at all. And I crawled off and got my gear off and started to help them, Dale and Don, move the chassis off the fence. I didn't see any of the injured people. I know there was some kids involved.' "

The trial judge permitted the case to go to the jury as to the negligence of Capital Raceway Promotions, Inc., the driver Marshall and the auto owners Creasey and Schumacher. The jury returned a verdict against Capital Raceways and awarded damages to the respective plaintiffs varying from $600 to $140,000 depending upon the severity of their injuries. The jury also returned verdicts in favor of Marshall, Creasey and Schumacher.

---

1. "Wheely bars" run behind the rear wheels from the axle to the back bumper to prevent the front end from rising when the automobile accelerates at high speeds. The speeds attained during a race are so great (over 200 mph) that parachutes are used to decrease the speed to a rate where brakes can be applied (*i.e.*, 60 or 70 mph).

Capital Raceway Promotions, Inc. appealed, asserting that there was no evidence that the track owner should have foreseen that a car would travel backwards from the starting line into the fence. It further claims that there was no evidence that any other similar tracks provided greater protection in this area. Also contested is the admission as to Capital Raceway of a statement which was used to impeach the driver Marshall.

The plaintiffs below, appellees here, filed a cross appeal from judgments in favor of the driver Marshall and the owners, Creasey and Schumacher. They question the judge's refusal to direct a verdict for them against cross-appellees Marshall, Schumacher and Creasey, defendants below. Cross-appellants also question the judge's failure to instruct the jury that " . . . a professional race driver under the circumstances is held to a higher standard of care and duty than a simple ordinary driver."

We find little difficulty in affirming the judgments below.

### Capital's Standard of Care

The appellant decries the failure of appellees to produce evidence "that any other similar tracks provided greater protection in this particular area." In short, the appellant contends that "there was no evidence of a standard and the jury was simply allowed to speculate." We do not agree and find no merit in the contention that evidence should have been required to establish a standard of care regarding the erection of protective facilities behind the starting line in the pit area.

In a Virginia case with remarkable similarities, a wheel broke away from a racing car, hurdled both a guard rail and a fence, and struck appellant, who was a spectator in the stands. Suit was instituted against the track as well as the driver and car owners. After affirming the equivalent of a directed verdict as to the defendant driver and car owners, the court met the precise issue presented here, *i.e.*, the responsibility of the plaintiffs to produce comparative standards for the jury through expert testimony. The court

declined to entertain such a requirement. As to the need for expertise the Supreme Court of Appeals of Virginia said:

> "No expert testimony was necessary to show that this fence was known or should have been known to experienced race track operators to be insufficient protection for spectators within the area provided for them.
>
> " 'Courts constantly have to refer to juries the question of what is reasonable conduct, or reasonable prudences under all the circumstances of the case, with no other guide than their own judgment and conclusion as reasonable men.' Chesapeake and Ohio R. Co. v. Allen, 137 Va. 516, 522, 120 S. E. 157, 158, Southern Stevedoring Corp. v. Harris, 190 Va. 628, 58 S.E.2d 302." *Atlantic Rural Exposition v. Fagan*, 195 Va. 13, 77 S.E.2d 368, 375.

A rule of thumb regarding the necessity for expert testimony was articulated by the District of Columbia Court of Appeals in *Waggaman v. Forstmann*, 217 A. 2d 310, 311.

> " . . . [T]o warrant the use of expert testimony the subject dealt with must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman . . . . [w]here the trier of facts is as competent as an expert to consider and weigh the evidence and to draw conclusions therefrom, it is improper to use expert testimony."

Regarding the need for producing evidence of other track's safety measures the Virginia court was even more pointed:

> " 'It was not for the jury to compare places and determine which was the safer, but to determine whether the place furnished was reasonably safe.' *Virginia Portland Cement Co. v. Seal*, 110 Va. 484, 486, 66 S. E. 75, 76." *Atlantic Rural Exposition v. Fagan, supra*, 77 S.E.2d at 374. See also 37 A.L.R.2d 378.

We think there was ample evidence from which a jury of reasonable persons could readily have determined that the defendant should have foreseen the possibility that just such an accident might occur. The track owner who provided these races for his own profit knew, or should have known, that the "square-mesh gears" of these powerfully propelled racing cars are difficult to shift; that each car performs at least two preliminary "burn-outs" necessitating backing up to a place near the stands behind the starting line; that the drivers are unable to see behind them because they are strapped in place in vehicles without a rear window; and that the distance between the fence at the edge of the track and the stands where appellants were injured was minimal. The only remaining question is whether an anchor fence is sufficient to protect the invited paying public from mechanical or human error in the pit, an area of frenzied activity.[2] " 'It was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye.' " *Palsgraf v. Long Island R.R.*, 248 N. Y. 339, 162 N. E. 99, 100, (opinion by Cardozo, Ch. J.) quoting *Munsey v. Webb*, 231 U. S. 150, 156.

### The Prior Inconsistent Statement

After concluding the testimony of the parties plaintiff, the appellees called a private investigator through whom were introduced photographs and statistics relating to the track. An unsigned statement taken from appellant Marshall was also read in part by the investigator. Contained in the statement were alleged remarks by Marshall which Capital admits " . . . did not form probative evidence on the merits," but contends " . . . nevertheless may have proved quite harmful to the appellant." The remarks and observations objected to were not read during the investigator's initial testimony but were subsequently used to impeach Marshall.

The only objection was made upon the proffer of the

---

2. It should be noted that the question of assumption of risk appears not to have been raised below or on appeal.

contents of the statement to be introduced through the investigator. The court's first reaction was to sustain the objection on the grounds that since there was no evidence that Marshall was an employee, agent or like associate of Capital, an admission against the interest of one party is not admissible against others who may happen incidentally to be joined as parties to a suit. Cf. *Chambers v. Chalmers*, 4 G & J 420; 29 Am. Jur. 2d, *Evidence*, § 658. Nevertheless, the court stated that from what had been proffered, " . . . the man [Marshall] has seen many tracks, raced at many tracks, so he does have expertise in this area . . . ." The court reasoned erroneously that, because he was qualified to testify on direct as an expert, the portion of the statement encompassing the subject of his expertise was admissible. In spite of that favorable ruling, the appellees stopped the investigator's recitation short of introducing that portion of the statement objected to by Capital.

Appellee then called Marshall as an adverse party and, adopting the reasoning of the court on the prior ruling, took advantage of Marshall's expertise. After testifying that he was a professional race car driver who since 1966 had "raced all across the country" he was asked without objection:

> "Now, will you tell us, as a matter of fact, most tracks have a concrete barrier behind the staging area, or a steel cable to stop the cars, don't they? " —

to which he responded, —

> "No, that is not true. Most race tracks the approach area around the race track is in a straight line with pits."

Then followed an attempt to impeach Marshall by examining him on the version of a statement taken from him by the investigator.[3]

---

3. "Q. Well, do you remember talking to Mr. Guiffrie, the gentleman who just testified?
"A. I certainly do.

234

Finally appellees recalled their investigator who quoted

"Q. Do you remember saying this to him, and I quote you:

'Most decent tracks have a concrete barrier behind the staging area or steel cable to stop the cars.' Do you remember that?

"A. I remember talking about other race tracks, but that statement is not quite true. Some of that statement that he had was out of text, and some parts are taken out altogether.

"Q. I am asking you if this one sentence here, and I will read the entire sentence, isn't a quote of what you said:

'I don't know what the safety regulations at the different tracks are, or who sets them, but most decent tracks have a concrete barrier behind the staging area, or a steel cable to stop the cars.'

"Do you remember saying that to Guiffrie when he spoke to you?

"A. No, sir, I don't.

"Q. You deny you said that?

"A. I don't remember saying it to him, sir.

"Q. You don't remember saying it?

"A. No, sir.

"Q. But you could have said it, couldn't you?

"A. I probably wouldn't say it, because that is not quite true.

"Q. It is not quite true?

"A. No, it is not. Most race tracks have an approach area behind the race track coming directly out of the pit area, so there would be no possible way to have a concrete wall in back.

"Q. What race tracks have the concrete wall behind them?

* * *

"A. The track at Miami Speedway has a similar type run around area as Capital, and it has a concrete four-foot wall in back of it, but the track at Miami was also used as a round roadway course, and the cars race in that area.

"Q. Do any other tracks have a concrete barrier?

"A. Off the top of my head I can't remember, sir.

"Q. Well, how about steel cables to stop the cars, what tracks have them?

"A. Several cars — I mean several tracks have steel cables along the edge of the race track.

"Q. Which ones would they be?

"A. I believe U.S. Steel in Gary has steel cable along the edges of the race track, one example.

"Q. Any others?

"A. I don't remember any offhand.

"Q. But there are others that have them?

"A. Along the edges of the track, yes.

"Q. And you have seen cars rammed backward into the wall in the Miami track, have you?

"A. There was an occasion when a race car backed into a wall in Miami.

"Q. One occasion?

from the version of Marshall's statement he had reduced to a written report:

> " 'I don't know what the safety regulations at the different tracks are, or who sets them, but most decent tracks have a concrete barrier behind the staging area, or a steel cable to stop the cars. I have seen cars ram backward into concrete wall at Miami track since my accident, several other cases too that I have heard of. The purpose of the fence is only to keep the people off the track and out of the staging and approach areas. They can't expect that fence to stop one of these machines. If I had been going any speed, well, you got to have concrete or steel wherever the cars could go out of control, and that is anywhere one is running. But you have to check with one of the sanctioning bodies to get the regulations on that. I have been driving a truck since this spring because the racing alone hasn't supported me well enough.' "

Although conceding that the judge's analysis of Marshall's

---

"A. That I saw, that I know of.

"Q. And there are others you heard of, weren't there?

"A. No, sir.

"Q. Do you remember saying the following to Mr. Guiffrie when he interviewed you:

'I have seen cars rammed backward into the concrete wall at the Miami track since my accident, other cars too that I have heard of.'

"Do you remember making that statement?

"A. I can't directly remember any other cars. I didn't see them. I saw one car in Miami back into the wall.

"Q. What happened when it backed into the wall? Did it go into the stands?

"MR. SCOTT: There is no evidence there is any stands there.

"THE COURT: Well, are you objecting?

"MR. SCOTT: I object to the question.

"THE COURT: Sustained.

"BY MR. DePAUL:

"Q. Well, now, you did see one car back into the concrete wall at the Miami track. What did the concrete wall do to that car?

"A. It stopped the car."

236

expertise may have been correct had the testimony been offered directly by him, appellant contends that the evidence was impeachment in nature and clearly inadmissible as substantive evidence against Capital, since Marshall refused to adopt the entire statement as his testimony. This argument appears meritorious since there was no evidence that Marshall was an agent of Capital or otherwise able to bind it. However, appellant fails to recognize the avenue of admissibility utilized by appellees.

The trial judge ruled that the proffered testimony of Marshall's observations at other tracks would have been admissible directly because of his experience " . . . at many tracks . . . ." The court's reference to " . . . expertise in this area . . ." we easily equate to the experience courts require as a foundation prerequisite to the admission of estimates of speed based upon a witness's observation. *See, e.g., Peoples Drug Stores v. Windham*, 178 Md. 172, 181-182. The court's acceptance of that foundation would have permitted Marshall to testify directly as to the contents of the controversial statement which would then have been admissible against Capital. We do not agree, however, that the statement would have been admissible when offered through an investigator. Such evidence would be hearsay of the most obvious sort.[4]

---

**4.** Although frequently challenged by textwriters, the view that a prior inconsistent statement is admissible to impeach the credibility of a witness but must not be accorded "any *substantive* or *independent testimonial value*" prevails in civil as well as criminal cases. 3A Wigmore, *Evidence,* § 1018 (3rd Ed. 1940); United States v. Rainwater, 283 F. 2d 386. *See also* McCormick, *Evidence,* § 251 (2nd Ed. 1972); Davidson, *The Previous Statements of a Witness,* 32 Aust. L. J. 38 (1958); Dow, *KLM v. Tullis: A New Approach to the Admissibility of Prior Statements of a Witness,* 41 Neb. L. Rev. 598 (1961); McCormick, *The Turncoat Witness: Previous Statements as Substantive Evidence,* 25 Texas L. Rev. 573 (1947); Note, 20 Cornell L.Q. 511 (1945).

Wigmore stressed that the hearsay rule was the only ground for denying any affirmative testimonial value to prior self-contradictions. He maintained however, that the whole purpose of the hearsay rule — to preclude out-of-court statements made by an absent person not subject to cross-examination — is fully satisfied when the declarant is present on the witness stand. 3A Wigmore, *supra,* § 1018 (b). McCormick and Morgan pointed out that it is inconsequential that the original statement was made without benefit of oath, penalty of perjury or cross-examination, for the declarant witness is presently under oath, and purports to remember and

Apparently appellees were aware of that distinction when they declined the benefit of the original favorable ruling by the court which would have allowed the controversial portion of the statement during the original testimony of the investigator. Appellee cut short the recitation and even objected successfully to cross examination on the withheld portion of the statement. By doing so they made the tactical decision not only to utilize the advantages of the adverse party rule but to better protect their record as well.

The trial judge's ruling that Marshall had sufficient "expertise" to testify as to his observations of the barriers used at other tracks to avoid accidents such as occurred at Capital is not at issue, the testimony having come in without objection. That being so, appellees could take advantage of a party's expertise and yet retain the privilege bestowed by Md. Code, Art. 35, § 9 (now Courts Art. 9-113) to " . . . interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party . . . ." *State, Use of Miles v. Brainin,* 224 Md. 156, 160. So much of that testimony elicited from Marshall in his area of "expertise" either directly or by acknowledging the correctness of the statement would have been admissible as substantive evidence against Capital. That which he denied should have been limited to the question of Marshall's credibility and not permitted as substantive evidence against Capital. The short answer here is that

narrate accurately, and both his prior statement and present testimony can be fully tested by his adversary. McCormick, *Evidence,* § 251 (2nd Ed. 1972); Morgan, *Hearsay Dangers and the Application of the Hearsay Concept,* 62 Harv. L. Rev. 177, 192.

Nevertheless, the orthodox rule has been consistently followed in Maryland. United States v. Custer Channel Wing Corp., 247 F. Supp. 481, *aff'd* 376 F. 2d 675, *cert. denied* 389 U. S. 850, *rehearing denied* 389 U. S. 998; Smith v. Branscome, 251 Md. 582, 589; Green v. State, 243 Md. 154, 157-158; Clay v. State, 211 Md. 577, 583; Sun Cab Co., Inc. v. Cusick, 209 Md. 354, 361; West v. Belle Isle Cab Co., 203 Md. 244, 253; Foble v. Knefely, 176 Md. 474, 485; Vandergrift v. State, 17 Md. App. 1, 3; Sun Cab Co. v. Walston, 15 Md. App. 113, 135, *aff'd* 267 Md. 559; Martin v. State, 1 Md. App. 324, 326.

A prior statement subsequently affirmed by the witness from the stand is, of course, properly admissible as substantive evidence. Gaskins v. State, 10 Md. App. 666, *cert. denied* 404 U. S. 1040, as is one which falls within any recognized exception to the hearsay rule, *see, e.g.,* Smith v. Branscome, 251 Md. 582, 589.

appellant did not object either to Marshall's testimony as an expert or to his cross examination as such. It raised no protest even when the investigator was recalled for the limited purpose of introducing the prior inconsistent statement for impeachment purposes. Finally the record reveals no request to the court for limiting or explanatory instructions related to this issue. That question not having been " . . . tried and decided by the lower court . . ." may not now be decided here. Md. Rule 1085.

### Cross-appeal

Appellees filed a cross appeal asserting their belief that the trial court should have directed a verdict of negligence as against Marshall, Schumacher and Creasey. We do not agree.

The evidence was sufficient to permit the question of negligence to be decided by the jury but not so conclusive as to warrant a directed verdict. The speed of the vehicle in backing up was estimated variously from 5 to 35 miles per hour. The fact that the brake pedal broke when applied created an extraordinary, if not emergency, condition demanding precipitous judgments by the driver. He was confronted with several choices:

> 1. turn the car notwithstanding his obscured vision to the rear and the presence of other persons and equipment on the periphery of the track.
> 2. hit the "kill-switch" which grounds the ignition and may or may not cause the engine to stop (just as a normal vehicle will continue running when the ignition is off if the motor is overheated).
> 3. turn off the fuel shut off valve which testimony indicated would not stop the vehicle's momentum.
> 4. force the locked gear from reverse to forward in order to stop the backward motion and propel the vehicle away from danger.

The driver chose the final alternative. We cannot say as a matter of law that because it did not work he was negligent. That was a question for the jury, not the court. *Miller v.*

*Reilly,* 21 Md. App. 465. Beyond that, the car owners and driver enjoyed no proprietary interests or rights in the leased premises.

The car that they used had been subjected to reasonable inspection and was believed to be safe. They were not responsible for the maintenance of the track or the fences, nor for the placement of stands for spectators. We see no breach of duty or negligence as a matter of law on their part and find adequate evidence to justify the jury's verdict in their favor.

Cross-appellants (plaintiffs below) complain also that the trial judge rejected a proposed instruction that a professional race driver under the circumstances is held to a higher standard of care and duty than an ordinary driver.

Maryland has never established standards to be followed by classes of drivers on the basis of their experience with motor vehicles. Although the question has never been precisely asked or answered by our appellate courts, dicta strongly indicate that neither the inexperience of a novice nor the professional experience of a truck driver affects the standard of care required of a driver. See, *e.g., Lemons v. Chicken Processors,* 223 Md. 362.

The court instructed generally but nonetheless properly on the standard of care to be applied:

> "Simply, this is a negligence case, and you are instructed as a matter of law that negligence is the failure to exercise ordinary care. It is the doing of some act which a person of reasonable prudence would not do, or the failure to do that which a person of reasonable prudence would do if he were actuated by those considerations which ordinarily influence everyday conduct.
>
> "You will further note that in the exercise of ordinary care the reasonably prudent person will vary his conduct in direct proportion to the danger which he knows or should know to be involved in his undertaking. The amount of caution required by the law increases with the danger that reasonably should be apprehended."

We see no error either in refusing the instruction of a higher standard of care or in declining to direct a verdict for the cross-appellants (plaintiffs) against the three individual defendants.

*Judgments affirmed.*
*Costs to be shared equally by appellant and cross-appellants.*