# Richmond

## James H. Coker, Etc. v. M. M. Gunter and W. O. Gunter, Etc.

January 15, 1951.

Record No. 3725.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Williams,, Cocke & Tunstall* and *Lawson Worrell, Jr.*, for the plaintiff in error.

*H. M. Woodward*, for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

The plaintiff, Coker, was painfully and permanently injured by a truck owned by Gunter and operated by Minggia. He brought an action for damages against Minggia, charging negligence, and another against Gunter, on the theory of *respondeat superior*. They were heard together as one action and at the conclusion of the evidence the court struck out the plaintiff's testimony, on the grounds that Minggia was not the servant of Gunter in the performance of the work which resulted in Coker's injuries, and that Coker and Minggia were fellow servants. The jury, nevertheless, returned a verdict in favor of Coker, which the court set aside and entered judgment in favor of the defendants. The plaintiff here challenges that ruling.

The evidence also raises issues as to the alleged negligence of Minggia, the driver, and the contributory negligence of Coker, the plaintiff, but those questions were not reached at the trial and are not involved on this appeal.

Coker, the plaintiff, was an employee of Lock Joint Pipe Company, which was engaged in laying in 23rd street a

40-inch pipe line for the city of Norfolk under a contract with the city. The pipe was being laid in a ditch about five feet wide, which Lock Joint was excavating with a motor-driven ditching machine, mounted on a caterpillar platform and equipped with a boom and shovel. The joints of pipe were about 16 feet long and when one joint was laid, the ditch was then filled and the excess dirt hauled away to places specified in Lock Joint's contract with the city.

The ditch ran north of and parallel with a side track of the Norfolk and Western Railway Company and its center line was only 13 feet 8 inches from the north rail of the track. The ditching machine was eleven feet wide and centered over the ditch, leaving a space of only 8 feet 2 inches between the side of the machine and the railroad track. The truck driven by Minggia was 7 feet wide and in removing the excess dirt he was required to back the truck in over this narrow space and out beyond the end of the boom for loading by the shovel. This movement was to be made only on signal from Coker or Matthews, foremen for Lock Joint.

On the day of the accident Minggia was executing this movement with the truck. Coker was back of the truck, kneeling down in its path where Minggia could not see him, and looking into a tool box. The truck ran over Coker's leg and caused the injuries complained of. Minggia claimed that Coker signaled him to back in. Coker said he did not.

The question now to be answered is, who was Minggia's master when this was done,—Gunter, his general employer, or Lock Joint, his special employer? The answer, as we shall see, is to be found by ascertaining which one had the power of control over Minggia at the time of the accident.

The controlling evidence is without conflict. Gunter was the owner of the truck and Minggia was his driver. Gunter paid Minggia his wages each week after deducting his income and social security tax. He carried Workmen's

Compensation insurance, which covered Minggia. Lock Joint also carried Workmen's Compensation insurance on its employees and its insurance carrier paid Coker's hospital bills, which were very large, and the compensation provided by law for his injuries. These actions were brought for the benefit of Coker and Lock Joint's insurance carrier.

Lock Joint had been engaged on this pipe-laying job four or five months. The company had no trucks of its own on the job but made an arrangement with Gunter to furnish trucks and drivers at the rate of $2.50 an hour for both. The driver was given a card on which Lock Joint's foreman recorded the time the truck and driver were used, and settlement was made between Gunter and Lock Joint every thirty days.

Gunter's only instruction to his driver was to report to Lock Joint, see Coker or Matthews and do the work he was directed by either of them to do. Gunter was not present at the job and had nothing to do with the work done by the truck and driver or the manner or method of doing it. He did not control and had no concern with the number of loads hauled by his truck while in Lock Joint's service. The driver took the truck back to Gunter each night and reported to him each morning to find where he was to go. The agreement between Lock Joint and Gunter did not cover a specific period. Gunter sent trucks as they were wanted and was not compelled to send one if he had none available when called. He was not required to send a certain truck or driver, but he always tried to send Minggia because Lock Joint liked his work "and it was a tight job to get in there."

Minggia had been driving a truck on the job for about two months when the accident happened, not continuously, but as needed. He reported at eight o'clock in the morning and worked until he was told to quit by Coker or Matthews. He hauled dirt and other things for Lock Joint, doing "whatever they wanted me to do." He had helped move sheet piling when not using the truck and when the pipe line

was being laid across Hampton Boulevard he was used to flag traffic.

Matthews, foreman or assistant superintendent for Lock Joint, and a witness for plaintiff, said that when the trucks reached the job they were operated under his direction, "they were working for the Lock Joint Pipe Company the same as I was." The testimony of Vaughan, the job manager for Lock Joint, also a witness for plaintiff, was that the driver would take orders from the foreman and manipulate the truck as he was instructed,—"take this load to such and such a place, back into alongside of the (ditching) machine, or come in forward, instructions along those lines;" that his company could not discharge a driver, only notify Gunter that he was not satisfactory; that they had no actual control over what he did and how he did; "He was there to perform a duty to us, to dispose of the material and what other errands we might ask him to do."

In *Densby* v. *Bartlett*, 318 Ill. 616, 149 N. E. 591, 42 A. L. R. 1406, relied on by plaintiff, it is said that the proposition is supported by many decisions, and probably disputed by none, that a servant in the general service of one master may be transferred, under contract or otherwise, to the service of another, so as to become for the time the latter's servant, with all the legal consequences of that relationship.

In an annotation to that case, beginning at page 1416 of 42 A. L. R., the author says the rule of *respondeat superior* rests on the power of control and direction, which must be as proprietor, in the sense of stopping the work or of continuing it, and determining the way it shall be done, with reference to the method of reaching the result, and not merely the result to be reached; that obviously when a servant in the general employ of one is lent to another, it becomes necessary to determine who was the master at the time the negligent act took place.

In *Ideal Steam Laundry* v. *Williams*, 153 Va. 176, 149 S. E. 479, we held that a servant in the general employ of the laundry and required to work one day a week at the

home of Malone, and while there was under the control of Malone and his wife, both as to the work performed and as to the method of doing it, and who was injured while working at Malone's home, was at that time the servant of Malone and not of the laundry. It was there stated, on the authority of *Atlantic Coast Line R. Co.* v. *Tredway*, 120 Va. 735, 93 S. E. 560, 10 A. L. R. 1411, that while selection of the servant, payment of his wages and power of dismissal are elements to be considered on the question of master and servant, they are not essential to that relationship; but the power of control is the most significant element bearing on that question. That principle has been often repeated and consistently adhered to. *Texas Co.* v. *Zeigler*, 177 Va. 557, 14 S. E. (2d) 704; *Tidewater Stevedoring Corp.* v. *McCormick*, 189 Va. 158, 52 S. E. (2d) 61; *Southern Stevedoring Corp.* v. *Harris*, 190 Va. 628, 58 S. E. (2d) 302.

In *Standard Oil Co.* v. *Anderson*, 212 U. S. 215, 29 S. Ct. 252, 53 L. ed. 480, cited in the *Tredway Case, supra,* and in many of the later cases, the plaintiff, who was employed by a master stevedore in loading a ship, was injured by a winchman in the general employ of the defendant. The defendant insisted that the winchman, for the time being and with respect to the work negligently performed, had become the servant of the stevedore. The court said that might be true, although the winchman was selected, employed, paid and could be discharged by the defendant. It was held, however, that the winchman was the servant of the defendant, because the power, the winch, the drum and the winchman were the defendant's, which furnished not them but the work they did to the stevedore; that what was done by the defendant was its own work, through its own instrumentalities and servant, under its own control. It was said that the giving of signals by the stevedore to the winchman was not the giving of orders but of information, and the winchman's obedience to those signals showed cooperation rather than subordination.

The court stated that "it sometimes becomes necessary

to inquire who was the master at the very time of the negligent act or omission," and "we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." 29 S. Ct. at pp. 253-4.

As stated in that case, though the rule is clear enough, its application to the infinitely varied affairs of life is not always easy. In applying it courts have given different weight to particular facts or different emphases to similar facts, with the result that there is conflict, or apparent conflict, among the decisions. The cases of *Densby* v. *Bartlett, supra; Boroughf* v. *Schmidt* (Mo. App.), 259 S. W. 881, and *Independence Indemnity Co.* v. *Carmical & Woodring,* 13 La. App. 64, 127 So. 10, cited by the plaintiff, held the general employer to be liable on the facts there; and see other cases cited in 60 C. J. S., Motor Vehicles, sec. 436c, p. 1089; 35 Am. Jur., Master and Servant, sec. 541, p. 970.

In *Linstead* v. *Chesapeake, etc., R. Co.,* 276 U. S. 28, 48 S. Ct. 241, 72 L. ed. 453, and in *Denton* v. *Yazoo, etc., R. Co.,* 284 U. S. 305, 52 S. Ct. 141, 76 L. ed. 310, the principles stated in the *Anderson Case* were applied and the servants of the general master held to be the servants of the special master to whom control had been transferred for the time being.

On the facts of the present case, we think the conclusion is required that Minggia, the driver of the truck, was the servant of Lock Joint at the time the alleged act of negligence was committed.

Gunter had no relation to the city of Norfolk in the work of laying the pipe line. That was Lock Joint's work. The moving of the dirt was not Gunter's business, but Lock Joint's. Gunter let Minggia and the truck to Lock Joint for whatever hauling and other work Lock Joint wanted done. Gunter retained no direction or control over either while they were about Lock Joint's work. The power of control and direction was entirely with Lock Joint, which told Minggia when to work and when to quit, where to

go and what to do, and specifically when and how to handle the truck in the movement which on this occasion resulted in the injury to Coker. The work being done was planned by Lock Joint, and the time, means and method of doing it were under its exclusive control. The injuries suffered by Coker were injuries growing out of the business of Lock Joint and a hazard of that business.

Minggia's obedience to Lock Joint's directions were not mere cooperation, but complete subordination. Lock Joint could not discharge him from Gunter's employ, it is true, but it could effectively discharge him from its own service if he was disobedient to its command. The facts here do not make a case where the servant of the general employer is about the work of the general employer and merely receives directions from the person to whom he is hired as to details for performing his general employer's business. Minggia was sent to Lock Joint to do Lock Joint's bidding, not only as to the work to be done, but as to the time and method of doing it.

*Beasley* v. *Whitehurst*, 152 Va. 305, 147 S. E. 194, is not distinguishable on principle from the case here. There Beasley kept automobiles for hire, the renter usually furnishing his own driver or driving himself. However, by written contract he agreed to furnish an automobile and driver to United States Shipping Board, "for use as per directions" of its representative, from seven in the morning until nine in the evening, at a flat rate of $13 a day. Out of this Beasley paid the driver $3 a day. While driving the automobile the driver negligently injured Whitehurst, who sued Beasley. It was held that Beasley on the day of the accident had nothing to do with the car and exercised no control over it or the driver, but they were subject to the sole control of the Shipping Board; hence the driver was not the servant of Beasley and Beasley could not be held responsible for his negligence.

In *Malisfski* v. *Indemnity Ins. Co.*, 4 Cir., 135 F. (2d) 910, the plaintiff, an employee of the city of Baltimore, was injured by a truck owned by an express company and

driven by an employee of that company. The company, under an arrangement of seven or eight years' duration, hired out the truck and its driver to the city for $1.50 an hour, but gave the driver no orders except to report to the highways department of the city for work. On the day of the accident the truck was being used to remove snow from the streets. The plaintiff's job was shoveling snow into the truck and a foreman of the highways department rode in the cab and directed the driver where to go. This foreman had complete control over the number of hours the driver worked and the places where he would take the truck. The question in the case turned on whether the driver was the servant of the express company or of the city. The opinion, by Judge Parker, said that the controlling principle was well stated in *Standard Oil Co.* v. *Anderson, supra,* and that the rule to be deduced from the cases is that the person causing the injury is the servant of him "who has the right to control not merely results but the progress and details of the work and the manner in which it is done." 135 F. (2d) at p. 912. It was held that "any presumption that the truck driver remained the servant of the express company, the owner of the truck, has been met by the proof of the special circumstances of the case and that he should be held the servant of the city." 135 F. (2d) at p. 914.

On similar evidence, in applying the same principle, the same result was reached in these cases: *Shapiro* v. *Winston-Salem,* 212 N. C. 751, 194 S. E. 479; *Gaston* v. *Sharpe,* 179 Tenn. (15 Beeler) 609, 168 S. W. (2d) 784; *Wylie-Stewart Machinery Co.* v. *Thomas,* 192 Okla. 505, 137 P. (2d) 556; *Hilgenberg* v. *Elam,* 145 Tex. 437, 198 S. W. (2d) 94; *McFarland* v. *Dixie Machinery, etc., Co.,* 348 Mo. 341, 153 S. W. (2d) 67, 136 A. L. R. 516. See also Restatement of Law of Agency, sec. 227, pp. 500 *ff.*

The plaintiff contends, further, that the court erred in concluding that the doctrine of *Feitig* v. *Chalkley,* 185 Va. 96, 38 S. E. (2d) 73, required the striking of the evidence as to the defendant Minggia. We there held that the

Workmen's Compensation Act, Code, 1950, secs. 65-1 *ff*, prohibits an injured employee from maintaining an action at law against his co-employee for negligence causing his injury. Plaintiff says that case should not control here for two reasons:

■ (1) If Minggia had been injured in the accident Gunter, not Lock Joint, would have been required to compensate him. That is a conclusion from the premise that he was Gunter's servant, and we hold he was not. But whether he was Lock Joint's employee, or the employee of Gunter as subcontractor doing part of the work of Lock Joint as general contractor, he could claim compensation from Lock Joint, and the question of ultimate liability would still turn on whose employee he was at the time of the accident. Code, 1950, secs. 65-27, 65-28, 65-30. In either event his only remedy would be that prescribed by the compensation law. *Sykes* v. *Stone, etc., Eng. Corp.,* 186 Va. 116, 41 S. E. (2d) 469; *Carlson* v. *Dowgielewicz,* 304 Mass. 560, 24 N. E. (2d) 538.

■ (2) Minggia is covered by an automobile liability insurance policy issued to Gunter, and a recovery against Minggia would not cost Minggia anything. The argument is that this ought to cause an exception to be made to the rule in *Feitig* v. *Chalkley, supra,* on the authority of *Worrell* v. *Worrell,* 174 Va. 11, 4 S. E. (2d) 343. We allowed a recovery there, contrary to the usual rule, by an unemancipated daughter against her father for negligence. This was because the father owned and operated the common carrier on which the daughter was injured while a passenger and the statute required him to have insurance for the protection of his passengers. The exception there was made in aid of a legislative purpose and policy. To make one here would thwart a legislative purpose and policy.

The court below decided correctly and its judgment is

*Affirmed.*