Richmond

## KAY MANAGEMENT CO., INC.

v.

## MARTHA L. CREASON

February 29, 1980.

Record No. 780368.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Poff, and Compton, JJ.

George C. Towner, Jr. (*Simmonds, Coleburn, Towner, Carman & Evans,* on briefs), for appellant.

Terrence Ney (*J. Jay Corson, IV: Boothe, Prichard & Dudley,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Martha L. Creason filed a motion for judgment in the trial court against Kay Management Co., Inc., and Herman F. Beard, Sr., for

damages for personal injuries allegedly caused by Beard's negligent operation of a backhoe on November 19, 1975. Beard died before trial, and the action was nonsuited as to him. At trial, a jury returned a verdict in favor of Creason against Kay in the amount of $95,000, and the trial court entered judgment upon the verdict. Kay has appealed, contending that Beard was not Kay's servant at the time of the accident, that Creason was contributorily negligent as a matter of law, and that the trial court erred in admitting certain evidence and in instructing the jury.

The accident was a bizarre one. Creason resided in Building 3622 of the Barcroft View Apartments, a 30-building apartment complex managed by Kay. On the day of the accident, she testified, she left her apartment at 7:40 a.m. to walk to a bus stop on Columbia Pike, north of the apartment complex, to take a bus to work. As she stopped at Barcroft View Terrace, the street adjacent to her building, Creason saw a backhoe turn left into the north end of the street that made at its south end a "T" intersection with Barcroft View Terrace.[1] The machine headed south on the street and moved down grade at a "very slow" speed.

Creason had intended to cross the intersection from the point where she was then standing on Barcroft View Terrace to the sidewalk on the east side of the access street. Instead of crossing there, however, Creason walked east on the Barcroft View Terrace sidewalk past the intersection and past several parked cars until she found a space between cars that was large enough for her to pass through. All vehicles on the street were parked perpendicular to the curb within lined spaces. Creason walked into the street between two parked automobiles, stopped at the rear of the cars and looked at the intersection to her left to see if the backhoe was "there yet". She saw nothing, but heard the backhoe, the noise from which reverberated among the nearby buildings so that, although she knew the machine was coming down the access street, she could not be sure of its location.

Creason began to cross the travel portion of Barcroft View Terrace from south to north in a straight line perpendicular to the axis of the street. As she proceeded, she reached into her handbag for bus tokens but continued to look ahead. When she was more than halfway across the street, she had "a sense of danger", and, looking to her left, saw

---

[1] Note: Apparently both streets were known as Barcroft View Terrace. To avoid confusion, we refer herein to that street running north and south that comprised the stem of the "T" as the access street, and to the street running east and west that crossed the "T" as Barcroft View Terrace.

the backhoe bearing down upon her three to five feet away. She estimated that she was then about 20 feet east of the intersection and no more than five feet from the cars parked perpendicular to the curb on the north side of the street. Creason, who was five feet, two inches in height, believed that she was struck in the head by the top of the backhoe's front-end loader or bucket, which she recalled seeing at eye level. Knocked to the ground, she was run over by the machine. She estimated that it took her five to seven seconds to walk from the rear of the parked cars on the south side of the street to the point near the cars on the north side where she was struck.

Beard, the backhoe operator, testified by deposition that he never saw Creason before the accident, and did not suspect that an accident had occurred until he parked his machine in preparation for excavation work. According to Beard, he drove the backhoe down the access street at not more than 1½ miles per hour, made a left turn into Barcroft View Terrace, and proceeded eastward close to the left side of the street, two and a half to three feet from cars parked on that side, to avoid any children that might dart out from the other side. He conceded that if he had been operating an automobile, he would have driven on his right-hand side of the street. Beard said that the bottom of the front-end loader was six to eight inches off the ground, so that he had a clear view ahead of him. After completing his turn at the intersection, Beard saw one of Kay's laborers whom he knew, walk across the street from south to north in front of him and climb into a pickup truck. Beard continued east and parked the machine at the work site. He let down the bucket in front and the hoe at the rear and cut off the engine. At that time someone called to him that there was a "lady in the street".

Mrs. Kathy B. Gallagher, a resident of Building 3628, was nearby when the accident occurred. She testified that just prior to the accident, she left home to take her children, ages three and seven, to school. Standing on the steps outside her apartment as the children ran ahead to her car parked on Barcroft View Terrace, Mrs. Gallagher, who was more than six feet tall in her shoes, saw and heard the backhoe coming down the access street. It was then about three parking spaces north of the swimming pool shown on Plaintiff's Exhibit 8, an aerial photograph of the area.[2] The equipment made a unique sound; it was not "a whole lot louder" than cars in the neighborhood, but it sounded different. She estimated the speed of the

---

[2] Although measurements are not given in the record, it appears that three parking spaces north of the swimming pool would be approximately 16 parking spaces north of a grassy triangle at the northwestern corner of the "T" intersection.

backhoe at 15 to 20 miles per hour, and, because of its speed and motion, Mrs. Gallagher was concerned for the safety of her children. Calling to them, she walked rapidly down the steps and sidewalk to the street to put the children into her car.

As she was unlocking the car, Mrs. Gallagher looked over the top and saw the backhoe on the north side of Barcroft View Terrace. It had turned the corner and had "just about straightened out". She could see the upper part of the operator's body, but his lower part was hidden from her view by the front-end loader, the bottom of which appeared to be above the ground three or four feet, the top five or six feet. Mrs. Gallagher noticed that the backhoe was "sort of making a bouncing movement". She heard a cry and saw Creason's body roll out from behind the right rear wheel approximately 15 to 16 feet east of the corner and come to rest in the street about five or six feet farther east. The backhoe was still moving at 15 to 20 miles per hour. Mrs. Gallagher tried unsuccessfully to wave the operator to a stop, but he was apparently unaware of what had happened, and continued on his course along the north side of the street until he stopped 80 to 90 feet east of Creason's body.

K. W. Morey, a Fairfax County police officer, investigated the accident. He found a blood spot 23 feet east of the intersection, and the backhoe parked 97 feet east of the blood spot. He measured the width of the street at 57 feet, the width of the travel area between the car parked on each side at 31 feet and width of the travel area between the perpendicular parking space lines on each side at 21 feet.

Beard, aged 62 at the time of his deposition, was a retired Government employee. He was operating the backhoe as a favor for his son, Herman F. Beard, Jr., who transacted business as Beard Plumbing & Heating, owned the machine, and leased it to Kay. Beard was not paid for his services, although Beard, Jr., made gifts to him from time to time and helped with his rent. Beard and his son drove the backhoe to the Barcroft View Apartments on Sunday night before the Wednesday on which the accident occurred, and parked it in a designated place on the premises, where it remained when not in use until the work was completed.

Beard testified that Kay's construction supervisor, "Frenchie" (Armand) Morrissette, was his "boss" for the work, and gave him his instructions, that he worked for Morrissette on the afternoon of November 18 either digging a hole or moving a sidewalk, and that he understood that the next day he would be required to excavate in front of one of the apartment buildings. On November 19, at approximately 7:30 a.m., Morrissette ordered Beard to report to Building 3628,

where Morrissette would meet him and "help" him. Morrissette did not describe the work to be done. Beard was proceeding to Building 3628 by the shortest available route when the accident occurred. Beard said that he had been operating a backhoe for 37 years.

After the accident, Beard said, Morrissette told him where to excavate, what length and depth to dig the hole, and where to put the dirt. Morrissette made suggestions about sloping the bank, and directed him to dig three feet farther back and move a bush. Once or twice Morrissette asked Beard "to lay it back a little bit . . . so he'd have a slope on it". Beard would have moved the machine or worked extra time at Morrissette's request, and would have followed, within reason, any instructions given by Morrissette as to his performance of the work. When Morrissette came on the earlier sidewalk job, on which Beard had operated the backhoe, "he took it over complete" and told Beard "everything from there on". Morrissette also closely supervised the excavation job. Beard recognized that Morrissette had the responsibility for seeing that the job was done properly and could require him to make any changes that were necessary to accomplish that purpose.

Morrissette described Beard's work at the apartment complex. Beard had used the backhoe there before November 19 and would use it again on and after November 19 in excavating a hole to enable Morrissette's workmen to re-waterproof the leaking wall of an apartment. That morning, Morrissette met Beard at the backhoe and told him to bring the unit to Building 3628. Over Kay's objection, Morrissette was permitted to testify to his supervision over Beard's work when Beard arrived at the work site after the accident. Beard knew nothing about what was to be done other than what Morrissette told him. He directed Beard to excavate in an area marked by stakes set by Morrissette. Morrissette had the right and power to tell Beard when and where to excavate, to discharge him and replace him with another backhoe operator, to change his method of performing the work, and to alter his working hours. Morrissette, who had 15 to 20 years of experience in operating heavy equipment such as a backhoe, had taught others how to use that kind of machine. Morrissette enjoyed the same right and power to control Beard's work on November 19 as he had exercised earlier on the sidewalk job and would retain throughout the several days of excavation work following the accident.

Beard, Jr., testified that he billed Kay for use of the backhoe from the time it was started in the morning until it was parked after work. He left the backhoe at the apartments for Kay's personnel "to use when they wanted to. . . ." His brother, Edward, was Kay's resident engineer. Beard, Jr., did not know or care what work was being done, so long

as his equipment was not damaged and he was paid for its use. His obligation was to furnish the backhoe, a competent operator, and fuel for the unit. He never gave his father any instructions as to the work to be done, and told him to get his orders from Morrissette. While his father was working at the apartments, Beard, Jr., visited the work site twice, for no more than ten minutes each time, but only to bring fuel for the machine. On one of these visits, he found that Morrissette was operating the backhoe. This machine was the only piece of heavy equipment owned by Beard, Jr.; prior to November, 1975, it had been used one time in work for Kay. Rental of the unit, as shown on an invoice of Beard Plumbing & Heating introduced into evidence, was billed to Kay at $16 per hour.

The present case concerns a so-called lent employee, one who has been temporarily transferred by his general employer to the service of another for a special purpose. Beard was employed generally by his son, Beard, Jr., and received his compensation, however indirect, irregular, and intermittent it was, from that employer. However, Beard was temporarily assigned, with the leased backhoe, to work for Kay. The question is whether Beard was Kay's agent at the time of the accident so as to make Kay liable for Beard's negligence. See Meek v. Graybeal, 195 Va. 381, 385, 78 S.E.2d 593, 595 (1953). The trial court, over Kay's objection, submitted this question to the jury under instructions that Kay does not challenge as to form and content. Kay contends, however, that the evidence shows as a matter of law that Beard was not its agent when the accident occurred, and that no jury issue was presented. We disagree.

The legal principles enunciated in Coker v. Gunter, 191 Va. 747, 63 S.E.2d 15 (1951), are controlling. In Coker, Gunter leased a truck and driver at an hourly rate to Lock Joint Pipe Company for use on a pipelaying project in which Lock Joint was engaged. The driver was subject to the direction and supervision of Lock Joint's personnel in operating the truck at the work site. He was not on Lock Joint's payroll, and Lock Joint could not discharge him from Gunter's employment, although it could discharge him from its own service. Gunter was never present at the job site, and had nothing to do with the driver's work on the project or with the manner and method of his performance of his duties.

A Lock Joint Employee who was injured on the job when struck by Gunter's truck brought an action for damages against Gunter and the driver, alleging that a proximate cause of his injuries was the driver's negligence. The trial court struck the plaintiff's evidence against Gunter on the ground that the driver was not Gunter's servant

at the time of the accident. Although the jury returned a verdict against Gunter, the trial court set it aside and entered judgment for Gunter, and we affirmed. We held that to determine whether a master-servant relationship existed between a special employer and a lent employee at the time of the alleged negligent act it was necessary to determine whose work was then being performed, usually by ascertaining who had the power to control the employee.

We summarized the evidence as follows:

> "Gunter had no relation to . . . the work of laying the pipe line. That was Lock Joint's work. The moving of the dirt was not Gunter's business, but Lock Joint's. Gunter let [the driver] and the truck to Lock Joint for whatever hauling and other work Lock Joint wanted done. Gunter retained no direction or control over either while they were about Lock Joint's work. The power of control and direction was entirely with Lock Joint, which told [the driver] when to work and when to quit, where to go and what to do, and specifically when and how to handle the truck in the movement which . . . resulted in the injury . . . . The work being done was planned by Lock Joint, and the time, means and method of doing it were under its exclusive control. The injuries suffered . . . were injuries growing out of the business of Lock Joint and a hazard of that business."

*Id.* at 754-55, 63 S.E.2d at 18. *See also Beasley, Etc.,* v. *Whitehurst,* 152 Va. 305, 147 S.E. 194 (1929).

In *Weaver* v. *Bennett,* 259 N.C. 16, 129 S.E.2d 610 (1963), upon which Kay relies, it was held that the operator of a backhoe leased, with numerous other pieces of heavy equipment, to another was not the agent of the special employer when the equipment struck a regular employee of the special employer at the work site. The lessor was in the business of renting equipment and operators. The written contract of lease did not indicate that the lessor intended to relinquish control, and, indeed, contained provisions that suggested a contrary intent. Moreover, the lessor's personnel maintained a daily check upon the operation of the equipment. We acknowledge factual similarities to the present case, but we believe it is appropriate, on the record before us, to apply the rationale of *Coker, supra.* Accordingly, we hold that the trial court did not err in submitting the agency question to the jury.

Although the master-servant relationship between Kay and Beard must be found to have existed at the time of the accident to

impose liability upon Kay, the trial court did not err in admitting evidence as to the details of Morrissette's supervision of Beard's work on the earlier sidewalk removal and on the later excavation job at Building 3628. Such evidence was relevant to a determination of the nature and extent of Kay's power to control and direct Beard in all aspects of his work for Kay.

The backhoe had been moved to Kay's premises to be used for whatever work Kay desired. At least two different kinds of specific tasks were required, but the backhoe remained on the property until all work for which it was used had been completed. The extent of Kay's power to control Beard's operation continued without variation, modification, or interruption throughout the period during which the equipment remained subject to Kay's use on property managed by Kay.

The performance of services furthering Kay's purposes began on November 19 when Beard started the engine of the backhoe. From that time Kay had the power to control Beard's actions. Kay's agent, Morrissette, could have ordered Beard to proceed to Building 3628 by a specified route at a prescribed speed. He could have arranged to transport the backhoe by truck, or to have another vehicle lead it, or to order it moved at another time when less vehicular and pedesrain traffic might have been anticipated than at 7:30 a.m. Indeed, he could have preceded the unit on foot, or directed a workman do so, to control its course and speed, and to warn others of its approach.

Although Morrissette was capable of operating the backhoe, and did operate it at least once, it was not essential to the establishment of his power to control that he tell Beard what gear to use, or what lever to pull, or that he otherwise exercise personal control over the operation of the machine. There was evidence from which the jury could reasonably infer that Morrissette had the power to control all of Beard's continuing work on the apartment property, including his movement of the backhoe from its assigned parking spot to the site designated for work on the day of the accident. Therefore, the master-servant question was properly submitted to the jury for determination.

■ After Creason had presented all her evidence, Kay moved to strike the evidence on the ground that Creason was contributorily negligent as a matter of law by failing to maintain a proper lookout. The trial court overruled the motion, holding that it was a jury question whether in the exercise of reasonable care Creason, after crossing the center of the street, should have "anticipated a sharp left turn on the wrong side" by the backhoe and kept a lookout in that direction. The court indicated that the motion would have been granted if

Beard had been operating on his right side of the street and had struck Creason on that side.

As a general rule, contributory negligence presents a jury question. *Phillips* v. *Stewart,* 207 Va. 214, 217, 148 S.E.2d 784, 786 (1966). Nevertheless, Kay argues that because Creason continued to hear the noise of the backhoe as it moved down the access street she must necessarily have been aware of impending danger and should have maintained a lookout in the direction of the noise. Her failure, therefore, to see the machine until it was three to five feet away, Kay says, constituted negligence that was a proximate cause of the accident.

The jury, however, could have reasonably inferred from the evidence that Beard increased his speed from 1-½ to 15-20 miles per hour as he drove down the incline of the access street after Creason first saw him, that Creason had no reason to anticipate that he would turn left rather than right at the intersection, and that she had no reason to anticipate that if he turned left he would cut sharply around the left corner of the intersection and then travel at unabated speed on the left side of Barcroft View Terrace. The jury could have concluded from the evidence that Creason was struck within five feet of the cars parked on the north side of the street, and that she could have reasonably assumed that if Beard turned east at the intersection he would drive east on the south side (his right side) of Barcroft View Terrace.

The jury was instructed that a vehicle moves 22 feet per second at 15 miles per hour, 29.34 feet per second at 20 miles per hour, and 2.2 feet per second at 1-½ miles per hour. There was evidence Creason took five to seven seconds to walk from a place of safety at the rear of parked cars on the south side of the street to the point near parked cars on the north side where she was struck. The jury could reasonably have inferred that the backhoe was a considerable distance back of the intersection when Creason looked in that direction, that the unit struck her within one second after it began its left turn into Barcroft View Terrace, and that she had insufficient time to avoid the accident.

■ In the present case, the status of the access street and Barcroft View Terrace bears upon the questions of primary and contributory negligence. Based upon the the evidence that Beard made a sharp left turn to the left of the center of the intersection and proceeded east on his left side of the street, Instruction 14 told the jurors that if they believed he made the turn in this manner he was negligent and Instruction 15 told them that if they believed he was on the "wrong side" of the street at the time of the accident, there was a prima

facie presumption that he was negligent. These instructions encompassed Code §§ 46.1-215 and 46.1-203, respectively, which were two of "The Rules of the Road", applicable to the operation of vehicles upon the highways of the State. Kay argues that, as the streets or roadways in the apartment complex were maintained by Kay for the benefit of the tenants, they were not highways to which the statutory rules applied.

Uncontradicted evidence discloses that Kay serviced and managed the streets at its expense, but posted traffic signs on the access street and elswhere "with the direction" of the local police and fire departments. It also appears from the evidence that the streets were paved, curbed, and bordered by sidewalks, and that they contained painted lines marking spaces for perpendicular parking. There is evidence that the travel section of Barcroft View Terrace was well-defined, extending 21 feet between the outer extremities of the parking space lines and 31 feet between the parked cars on each side. A single short paved street or roadway provided the only apparent entrance to the apartment complex from Columbia Pike. There is no evidence that the streets or roadways of the complex were restricted exclusively to the private use of the apartment dwellers or those persons who visited them. There is no evidence that access was denied to the public by security guards, gates, or warning signs. The streets contained parking spaces for the convenience of apartment occupants, and they carried traffic along the travel portions. The streets may have been intended for the primary purpose of providing parking areas for apartment tenants, but there is no evidence that they were constructed only for this purpose.

Code § 46.1-1(10), in effect at the time of the accident, defined "highway" as follows:

> "The entire width between the boundary lines of every way or place of whatever nature open to the use of the public for purposes of vehicular traffic in this State, including the streets, alleys

---

[3] By Acts 1979, c. 100, this statute was amended to define "highway" as follows:

"Highway".—The entire width between the boundary lines of every way or place of whatever nature open to the use of the public for purposes of vehicular travel in this State, including the streets, alleys and publicly maintained parking lots in counties, cities and towns *and for law-enforcement purposes, the entire width between the boundary lines of all private roads or private streets which have been specifically designated "highways" by an ordinance adopted by the governing body of the county, city or town in which such private roads or streets are located.* (Emphasis added shows language included by 1979 amendment).

and publicly maintained parking lots in counties, cities and towns." [3]

Code § 46.1-1(22) defined "private road or driveway" as follows:

"Every way in private ownership and used for vehicular travel by the owner and those having express or implied permission from the owner, but not by other persons."

The trial court ruled that the streets in the apartment complex were highways within the statutory definition. Kay, relying upon *Prillaman* v. *Commonwealth*, 199 Va. 401, 100 S.E.2d 4 (1957), and *Parker* v. *DeBose*, 206 Va. 220, 142 S.E.2d 510 (1965), challenges this ruling.

*Parker* is inapposite. There, the accident occurred in a passageway located between the rear of stores in a shopping center and an area designated for the parking of vehicles. The parties stipulated prior to trial that the collision occurred on private property and that rules of the road imposed by statute or ordinance would not apply. Accordingly, we held that in giving an instruction based upon the statutory Rules of the Road the trial court committed reversible error.

In *Prillaman,* the defendant was charged with the misdemeanor of operating a vehicle upon a highway after his license had been revoked. The evidence was that he drove his car across a service station lot from the rear of the property to the front. We held that the premises were not open to the use of the public for purposes of vehicular traffic and did not, therefore, constitute a "highway" within the statutory definition. As the defendant was not operating upon a highway, we reversed his conviction. Kay attaches undue significance to·language in the opinion suggesting that public maintenance as well as common enjoyment were required to bring private property within the definition of "highway". The case was decided solely upon the basis of the statutory definition that included no requirement of public maintenance.

We believe that the present case is more nearly analogous to *Morris* v. *Dame's Ex'r.,* 161 Va. 545, 171 S.E. 662 (1933). In that case, we held that although a freight yard road was not a State or county road it came within the definition of "highway" under the statute regulating the operation of vehicles on highways. The statute, Acts 1926, c. 474, p. 766, defined a "highway" as "[e]very way or place of whatever nature open to the use of the public for the purpose of vehicular travel". Thus, for many years the Rules of the Road have

applied to ways on private property that are open to public use for vehicular travel.

We hold that the evidence of accessibility to the public for free and unrestricted use gave rise to a prima facie presumption that the streets of Barcroft View Apartments were highways within the definition of Code § 46.1-1(10). It thereupon became Kay's burden to rebut the presumption by showing that the streets were used for vehicular travel exclusively by the owners and those having either express or implied permission from the owners. No such evidence appears in the record. On brief, Kay argues that the means of access to the property from Columbia Pike exist "primarily" for the use of the tenants. Undoubtedly, this assertion is correct, but it does not meet the test of exclusive use required by Code § 46.1-1(22) in defining a private road or driveway. Therefore, we hold that the trial court did not err in ruling that the Rules of the Road applied, and in granting Instructions 14 and 15 based upon that ruling.

■ We find no error in the trial court's refusal to grant certain instructions proffered by Kay. Instruction H, as given, adequately presented Kay's theory that one in the exercise of ordinary care has the duty to look and avoid the danger that a proper lookout would disclose, and that if one looks and fails to see what an ordinary prudent person would have seen in time to avoid danger, he is as guilty of negligence as if he failed to maintain any lookout. The additional language requested by Kay and rejected by the court was redundant and unnecessary.

Instruction K would have told the jury that a pedestrian may not step into a street between intersections where his presence would be obscured from the vision of drivers of approaching vehicles. This instruction is inapplicable to the facts in the case and was properly refused. Creason stopped and looked from a position behind two parked cars, and then walked almost to the opposite side of the street. The trial court ruled that Creason's stepping from between cars on the south side had no causal relationship as a matter of law to the accident. We agree. There is no evidence that Creason was not plainly visible to approaching drivers from the time she stopped and looked until she was struck at a point past the middle of the street.

Instruction N would have told the jury that a general employer remains liable for the negligence of his servant unless it affirmatively appears that he has "completely relinquished" control of the servant's conduct, from which the alleged negligence arose, to the special employer. The trial court properly refused the instruction because the liability of the general employer was not in issue. The law under which

liability may be imposed upon a special employer for negligence of a lent employee had been set forth in Instruction 2, granted without objection as to form. It was not necessary to restate it in Instruction N which, as tendered, might have misled the jury. There need not be a complete relinquishment of control by the general employer. Both the general and the special employer may have some measure of control over the servant for different purposes.

For the reasons assigned, we hold that the trial court did not commit reversible error, and we will affirm the judgment entered upon the jury verdict.

*Affirmed.*